IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS MIRANDA-CORTEZ,<br>EDUARDO MIRANDA-CORTEZ,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No.  2:11-cr-0580-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

On April 16, 2012, the court issued an order suppressing the admission of drugs seized in the basement apartment inhabited by Defendant Eduardo Miranda-Cortez ("Eduardo") in the house of Defendant Carlos Miranda-Cortez ("Carlos") upon consideration of two  motions to dismiss filed by Eduardo [Dkt. No. 25] and Carlos  [Dkt. No. 33].  In the same order, the court stayed its ruling with respect to evidence found upstairs in Carlos' house and statements made by Carlos and Roseli Valenzuela-Lopez ("Roseli"), pending supplemental briefing of the parties. Based on the supplemental briefing, and for the reasons stated below, the court now GRANTS IN PART and DENIES IN PART Defendant Eduardo Miranda-Cortez's motion to suppress with respect to the outstanding pieces of evidence and GRANTS IN PART and DENIES IN PART Defendant Carlos Miranda-Cortez's motion to suppress.

## FACTUAL BACKGROUND

On May 19, 2011, eight to ten members of the Utah County Major Crimes Task Force met to discuss a "knock-and-talk" operation focused on a house in which both Defendants were residing following surveillance of a controlled drug-buy and what were believed to be other drug-related activities at the house. At least seven officers took part in the operation, including Officer Jarid Barney, Officer Scott Spieth, and ICE Agents Carlos Gamarra and Marshall Mathis. Later this same day, a group of these law enforcement officers approached the front door of the house with the plan of using an illegal alien investigation as a pretext for gaining access to the home to further investigate the drug allegations. Because of conflicting testimony, the court cannot determine exactly which officers approached the house.

As the officers approached the house, Carlos and Roseli appeared at the front door. The officers asked the couple about their familiarity with a suspected illegal alien depicted in a photograph that was shown to them, but they responded that they did not know the person. The officers asked who lived in the basement of the house. Carlos responded that it was his brother Eduardo. The officers asked if they could speak with Eduardo, and Carlos took Officer Spieth and another officer around the house to the basement's outside access.[1]

Carlos and Roseli, who identified themselves as the owners of the home, also invited Agents Gamarra and Mathis to enter the house upstairs at the front door. Tr. of Evidentiary Hr'g 188 [Dkt. No. 77]. Agent Gamarra testified at an evidentiary hearing that he recognized Roseli as being an individual who had previously been deported from the United States. *Id*. at 191. Agent Gamarra testified that, upon entering the house, he obtained consent from Roseli to bring additional officers into the house to do a protective sweep. *Id*. at 192. After the conclusion of

---

[1] A more detailed description of the facts surrounding the discovery of drugs in Eduardo's basement apartment can be found in the court's order of April 16, 2012.

the protective sweep, Agent Gamarra asked Roseli if she had been previously deported. *Id*. at 194. Roseli admitted that she had been and Agent Gamarra told her she was under arrest for immigration violations and informed her of her *Miranda* rights in Spanish. *Id*. Agent Gamarra testified that Roseli indicated that she understood her rights and waived them. *Id*. Neither Defendant has challenged that, once the officers were in the house, Roseli gave this interview voluntarily.

Agent Gamarra told Roseli that there had been complaints about narcotics distribution coming from that residence, and Roseli indicated that she was willing to talk but that she did not want Carlos to find out. *Id*. at 195. For additional privacy, Agent Gamarra, Agent Mathis, and Roseli moved from the living room to a laundry area, where the door was shut. *Id*. at 195-96. Agent Gamarra testified that while in the laundry room Roseli admitted that there were narcotics in the home, which she believed to be methamphetamine. *Id*. at 196. Roseli further informed Agent Gamarra and Agent Mathis of the exact location of the drugs and how much would be found. *Id*.

Following this admission by Roseli, Agent Gamarra stopped the interview and contacted Detective Barney to tell him that Roseli had informed him that there were drugs upstairs in the home. *Id*. at 197. At that time, Detective Barney informed Agent Gamarra that officers had found drugs in the basement of the home and were seeking a search warrant. *Id*.

Detective Barney then engaged in a second interview with Roseli. *Id*. at 199. Prior to that interview, Roseli was informed of her *Miranda* rights for a second time and was offered a written waiver to sign. *Id*. at 198. Agent Gamarra testified that Roseli refused to sign the waiver because she did not want to sign anything with her name on it, but that she agreed to continue

talking without an attorney present. *Id.* In the second interview, Roseli gave additional information about where the drugs came from and how much they cost. *Id.* at 198-99.

After the second interview with Roseli, Agent Gamarra and Detective Barney interviewed Carlos about the drugs. *Id.* at 199. Agent Gamarra testified that prior to the interview with Carlos, no one had done anything to curtail the liberty of Carlos and that he was informed of his *Miranda* rights in writing. *Id.* at 200. Carlos signed a written waiver of rights form. *Id.* During the interview, Carlos was asked about the drugs found in the basement and eventually, after initially denying, admitted that there were also drugs upstairs in the house and that Carlos and Eduardo had obtained them with the intention to distribute them. *See* Tr. of Interview of Carlos Miranda-Cortez, Gov't Ex. 8A [Dkt. No. 67].

Based on the discovery of drugs in the basement, where Eduardo was living, and on the admissions of Roseli and Carlos that there were additional drugs upstairs in the home, an affidavit for a search warrant was prepared by Officer Spieth and a search warrant was issued for a search of the entire premises and of several vehicles. *See* Search Warrant, Gov't Ex. 1. A search was performed, pursuant to the warrant, and a small cooler was found in the attic of the house that contained methamphetamine and cash. Tr. of Evidentiary Hr'g 229 [Dkt. No. 77].

Eduardo and Carlos were subsequently indicted for possession of 500 grams or more of methamphetamine, with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). *See* Indictment 1-2 [Dkt. No. 1].

## ANALYSIS

"The Fourth Amendment protects the right of the people to be secure . . . against unreasonable searches and seizures." *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006) (citation omitted). "The basic purpose of this Amendment . . . is to safeguard the privacy

and security of individuals against arbitrary invasions by government officials." *Id*. (citing *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). To further these interests, the Supreme Court has held that "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978).

The court has already held that the government has failed to show that their warrantless search of Eduardo's downstairs apartment was constitutionally permitted, and has granted Defendants' motions to suppress the drugs found in the basement. The court now addresses whether statements made by Roseli and Carlos to the police should be suppressed as fruit of the illegal search of the basement where Eduardo was living. The court will also address whether evidence discovered pursuant to the execution of a search warrant of Carlos's upstairs residence should be suppressed.

I.      STATEMENT OF CARLOS

A.      Carlos has standing to challenge the basement evidence

The court must first consider, as a threshold issue, the merits of the government's contention that Carlos lacks a sufficient constitutionally protected interest in Eduardo's basement apartment to seek the exclusion of his own subsequent statement to police about drugs hidden upstairs. Carlos made this statement upon learning of the discovery of drugs during the illegal search of the basement and this statement was then used as support for the search warrant affidavit. Additionally, because the court did not analyze whether Carlos had standing to challenge the admissibility of the drugs found in Eduardo's downstairs apartment in its prior order excluding that evidence, it will decide that issue here. As discussed below, the court finds

that Carlos had a legitimate expectation of privacy in the basement apartment of his house where his brother Eduardo was residing and thus may challenge the admissibility of the evidence discovered there.

"[S]tanding to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Thus, the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 353 (1967)). This determination rests on a two part inquiry: "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Bond v. United States*, 529 U.S. 334, 338 (2000) (internal quotation marks and citations omitted).

Carlos argues that he has a constitutionally protected interest in the basement apartment under the Fourth Amendment on two grounds. First, he argues that the search of Eduardo's downstairs apartment was "motivated and facilitated" by the officers' illegal entry of the upstairs residence and the curtilage of the backyard, making the entry of the basement apartment a fruit of a violation of Carlos' constitutional rights. Second, Carlos argues that he had a legitimate expectation of privacy in Eduardo's downstairs apartment.

The court rejects Carlos' first argument both as to the allegedly nonconsensual entry of the upstairs and as to the curtilage because it finds that Carlos' testimony on these points was not

credible. Carlos' testimony that the officers did not have consent to enter the upstairs of the house at the front door conflicts with the testimony of those officers. Agent Gamarra testified that he entered the upstairs residence only after obtaining consent from Roseli. *See* Tr. of Evidentiary Hr'g 192 [Dkt. No. 77]. The testimony of other witnesses at the scene corroborates Agent Gamarra's story. This testimony is sufficient to establish that Agent Gamarra had consent to enter the upstairs residence and talk with Roseli. The consensual upstairs entry cannot provide Carlos with a basis to challenge the admissibility of the downstairs' evidence. Similarly, Carlos' argument with respect to the curtilage of the house is also unconvincing. Carlos argues that he was compelled to go with the officers into the backyard and to the door of the basement apartment. The only evidence that the officers' entry into the backyard curtilage was done without consent is Carlos' testimony that Officer Spieth commanded him to take him to the backyard with his hand on his weapon. Carlos' testimony on this point is not credible in the face of the testimony of every other witness at the scene confirming that entry into the backyard was done with the voluntary consent of Carlos. Moreover, the backyard was open to public view and it is questionable whether Carlos had a reasonable expectation of privacy for such space.

Carlos next argues that he had a legitimate expectation of privacy in the downstairs apartment and is therefore capable of claiming protection under the Fourth Amendment from the illegal search performed on the basement apartment. Consistent with *Bond*, the Tenth Circuit has recently reiterated that a person has a legitimate expectation of privacy when he or she (1) has "manifested a subjective expectation of privacy in the area searched" and where (2) "society is prepared to recognize that expectation as objectively reasonable." *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012) (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2010)).

### *1. Carlos has an actual or subjective expectation of privacy*

In evaluating whether a defendant has "manifested a subjective expectation of privacy in the area searched", *Ruiz*, 664 F.3d at 838, the court looks to whether defendant "has shown that he sought to preserve something as private", *Bond*, 529 U.S. at 338. As *Bond* illustrates, this finding can be relatively easily established. There, the Supreme Court found that the petitioner's act of putting drugs in an opaque bag and placing them directly above his seat on a bus was sufficient to show this subjective expectation. *Bond*, 529 U.S. at 338. Similarly, in *United States v. Gomez*, where agents found drugs in a truck owned by a third party that was parked on defendant's driveway, the Fifth Circuit vacated the defendant's conviction and held that the defendant had a reasonable expectation of privacy in the contents of the truck. 276 F.3d 694, 698 (5th Cir. 2001). The *Gomez* court concluded that the defendant had a reasonable expectation of privacy in the vehicle, though he did not own it, because it was parked on his property and, relevant to the subjective expectation prong, also because the evidence was "known to him because it was the subject of the unlawful enterprise in which he took part." *Id.* at 697. Thus, "there is no real doubt that Gomez had a subjective expectation of privacy with respect to the truck parked on his driveway. Otherwise, he hardly would have been likely to allow [his accomplices] to stash the marihuana there while the truck was in his driveway." *Id.* (internal quotation marks and citations omitted). Similarly, in *United States v. King*, the Sixth Circuit easily disposed of the subjective expectation inquiry, holding simply that the defendant "exhibited an actual subjective expectation of privacy in the basement by hiding the cocaine there." 227 F.3d 732, 744 (6th Cir. 2001).

Here, Detective Barney testified that Carlos acknowledged (in the interview statement that Carlos is seeking to suppress) that he and Eduardo were partners in the "business" of dealing

drugs though Carlos was ultimately responsible so that Eduardo would have to come to him for permission or to let him know he was moving drugs. Tr. of Evidentiary Hr'g 29 [Dkt. No. 76]. Additionally, the transcript of Carlos' interview with Agent Gamarra and Detective Barney is sufficient to establish that he knew that there were or very well might be drugs in Eduardo's basement apartment and that he had expected them to remain private. *See* Tr. of Interview of Carlos Miranda-Cortez, Gov't Ex. 8A [Dkt. No. 67]. As in *Bond*, *Gomez*, and *King*, therefore, the court finds that there is no real doubt that Carlos had a subjective expectation of privacy with respect to the drugs found in Eduardo's basement apartment.

This, however, is not the end of the inquiry into whether Carlos is capable of claiming the protection of the Fourth Amendment with respect to an expectation of privacy in the searched area. As the *Ruiz* court noted, "even if [defendant] had a subjective expectation of privacy" in the area searched, the court must still evaluate whether an "objectively reasonable" expectation of privacy existed. 664 F.3d at 839.[2] The court must therefore also determine whether Carlos had an objectively reasonable expectation of privacy in the basement apartment of his house where his brother Eduardo resided.

### 2. Carlos' expectation of privacy is objectively reasonable

The Supreme Court has noted that courts have "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). Rather, multiple factors have been recognized as relevant to the

---

[2] In *Ruiz*, the Tenth Circuit agreed with Sixth Circuit precedent in holding that "a defendant has no objectively reasonable expectation of privacy in a hangar that he does not control." *Id.* at 838 (citing *United States v. Porter*, 701 F.2d 1158, 1164-65 (6th Cir. 1983)). Although Ruiz might have had a subjective expectation of privacy in the drugs hidden in his parked airplane, the owner of the hangar where he had parked the plane maintained control over the hangar at all times, the hangar also stored aircraft and equipment of the owner and other customers, and the defendant did not have access to the hangar after business hours. *Id.* On the basis of these factors, Ruiz's expectation of privacy "was not an 'objectively reasonable' one." *Id.* at 839.

inquiry, including "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999).

In *McCaster*, the Eighth Circuit found based on these factors that the defendant did not have this expectation of privacy in a hall closet located in the common area of a duplex and that was used by two other tenants and the landlord, particularly as the valid warrant authorized the search of the apartment, garage, outbuildings and curtilage. *Id.* On the basis of the same factors, by contrast, the Fifth Circuit found that the defendant, a bookkeeper charged with illegal gambling and false reporting on his tax returns, possessed a legitimate expectation of privacy in his parents' bedroom in their home where he did not live but had hidden documents. *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir. 1981) (denying motion to suppress because although defendant had a legitimate expectation of privacy in the parents' bedroom, the search was conducted pursuant to an adequate warrant). These factors, however, are not "intended to be exhaustive." *Bevan v. Smartt*, 316 F.Supp.2d 1153, 1161 (D. Utah 2004). In fact, "a finding that none of the factors had been satisfied would not necessarily end the inquiry into whether a reasonable expectation of privacy existed." *Id.* Rather, "[t]he totality of the circumstances determines whether a defendant has a legitimate expectation of privacy in place searched by the government." *United States v. Macias-Treviso*, 42 F.Supp.2d 1206, 1211 (D.N.M. 1999) (finding that defendant did not have an expectation of privacy in the detached garage, which he used solely for commercial purposes, of his brother's unoccupied and unfinished house).

Ownership or lawful possession of property receives substantial weight in considering the totality of the circumstances for purposes of this inquiry. *Rakas*, 439 U.S. at 143 n.12 ("one who

owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude"). But a legitimate expectation of privacy protected by the Fourth Amendment "need not be based on a common-law interest in real or personal property, or on the invasion of such an interest." *Id.* For example, the Supreme Court has held that "an overnight guest has a legitimate expectation of privacy in his host's home", *Minnesota v. Olson*, 495 U.S. 91, 98 (1990), and that the existence of a "previous relationship" or indications of "a degree of acceptance into the household" are helpful considerations in making this determination. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (holding that defendants had no legitimate expectation of privacy in an apartment where they had no previous relationship with the owner and there was no other purpose to their visit than a business transaction relating to the drugs at issue). Following the logic of this rule, the Tenth Circuit recently held that a social guest with a "degree of acceptance into the household" or an "ongoing and meaningful connection to [the host's] home" has a legitimate expectation of privacy in the host's home even where the social guest does not stay overnight. *United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009). This expectation of privacy extends to periods of time "when the defendant continued to be an invitee or guest at the premises searched." *United States v. Cook*, 344 Fed. App'x 473, 476 (10th Cir. 2009).

Instructively, the Sixth Circuit assessed the "previous relationship" and the "degree of acceptance into the household" of a defendant with respect to a claimed expectation of privacy in searched premises. *United States v. Heath*, 259 F.3d 522 (6th Cir. 2001). In *Heath*, the defendant claimed a constitutionally protected expectation of privacy in his cousin Horton's apartment. The Sixth Circuit reversed the district court's finding that Heath lacked such an interest, holding instead that the evidence resulting from the search of Horton's apartment should

have been suppressed.  *Id.* at 533.  Police had surveilled and ultimately detained Heath for suspicious activity.  They had then used keys found on his person to enter the apartment building and had eventually gained access to his cousin's apartment where they found drugs.  Citing *Olson* and *Carter*, the Sixth Circuit held that "it is clear that Heath maintained a legitimate expectation of privacy in Horton's home" based on "several indications of acceptance into the household", including that he periodically slept there and enjoyed "unfettered access to the apartment" and the "ability to admit and exclude others" because he had a key. *Id.*  In addition, the court emphasized that as cousins, Heath and Horton's "familial tie is clearly a relationship which pre-dates the apartment's use for illegal conduct".  *Id.* (internal quotation marks and citations omitted).

Also, in *United States v. King*, the Sixth Circuit examined the nature of a small, two-unit duplex as opposed to a multi-unit apartment building.  227 F.3d at 744-48.  Because "the Fourth Amendment protects people, not places", *id.* at 748 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)),  the Sixth Circuit found it necessary to consider the "unique nature" of a two-unit dwelling, the common basement to that unit and the "circumstances under which Defendant was using the basement".  *Id.*  The Sixth Circuit held that an officer exceeded the scope of the warrant by searching the common basement of the two-unit dwelling where the warrant only authorized a search of the first floor.  *Id.* at 750.  The defendant lived in one of the units with his brother, and their mother and siblings lived in the other unit.  *Id.* at 738.  Looking to the factors reviewed above in the discussion of *McCaster* and *Haydel*, the Sixth Circuit found that

> Defendant had a property or possessory right in the basement insofar as he was a tenant of the two-family dwelling and, as a result, was permitted to use the basement including the washer and dryer. Furthermore, according to the testimony, the basement was not open to the public and Defendant had a right to exclude anyone who was not a tenant from the basement area, unless that person had been invited by one of the other tenants. Defendant was legitimately on the premises

inasmuch as he paid rent to live in the lower unit, and he took normal precautions to maintain his privacy in the basement area insofar as the basement was not open to the public, the other tenants were family members, and there was an outside door to the basement which remained closed. *Id.* at 749.

And particularly insightful for the present analysis is the fact that, in *King*, "although there were two living units, they all lived there as one family." *Id.* at 748.

Here, under the totality of the circumstances, Carlos has a similar expectation of privacy in his brother Eduardo's basement apartment because the court finds sufficient indications of Carlos' acceptance into the household of Eduardo in addition to the fact that their familial tie as brothers "is clearly a relationship which pre-dates the apartment's use for illegal conduct." *Heath*, 259 F.3d at 533.

Carlos and Roseli identified themselves as the owners of the home when police approached it on the day in question. Tr. of Evidentiary Hr'g 188 [Dkt. No. 77]. At an evidentiary hearing, Carlos testified that he had rented the entire house, including the basement apartment that his brother Eduardo occupied and another apartment in a converted garage, for $1000. Tr. of Evidentiary Hr'g 285-86 [Dkt. No. 64]. Carlos had a written contract for the lease and testified that he "share[d] the rent" with Eduardo, *id.* at 329, although without any written contract or lease between the two of them, *id.* at 286. It is not clear from the record, however, how much Eduardo actually contributed to the rent or how often. In any event, the government does not dispute that this was the living arrangement of the residents of the home, and officers testified as to observing children of the home frequently going back and forth between the front and basement entrances to the home apparently at will. Tr. of Evidentiary Hr'g 11 [Dkt. No. 76].

Also, although there was no specific testimony about whether Carlos had a key to Eduardo's apartment,[3] Carlos had access to the basement apartment through an internal door from the kitchen upstairs and he testified that he had made use of that entrance many times. Tr. of Evidentiary Hr'g 300 [Dkt. No. 64]. Since the internal door could only be opened from the upstairs side where Carlos lived and he used this door on multiple occasions, *id.*, this implies to the satisfaction of the court, given the familial relationship, that Carlos had the ability to enter the basement at will, especially since he was the tenant responsible for the rent for the entire house. Although there was conflicting testimony, Carlos also argues that he had permission to enter his brother's basement apartment from its front door without knocking to support his claim that he had a sufficient expectation of privacy in the basement apartment. *See* Defendant Carlos Miranda's Brief in Support of Motion to Suppress Evidence 32-32 [Dkt. 66]. The government, on the other hand, argues that Carlos had no expectation of privacy in the basement apartment because "he did not reside in the basement." Resp. of United States to Supp. Briefing 6 [Dkt. 85].

The government cites *United States v. Beckstead*, 500 F.3d 1154 (10th Cir. 2007) for the proposition that "a defendant did not possess a reasonable expectation of privacy in his girlfriend's apartment when the defendant did not reside in the apartment." Resp. of United States to Defendants' Mot. to Suppress 27 [Dkt. 72]. The government's reliance on *Beckstead* is unpersuasive in the context of the facts in this case and in light of the authority discussed above. In *Beckstead* the Tenth Circuit held that the evidence was insufficient to show defendant suffered a violation of his Fourth Amendment rights where the evidence only established that the

---

[3] In fact, the record contains conflicting testimony about keys to the basement apartment in that Eduardo testified that they had lost the key to the front door of the basement and that it therefore could not be locked, Tr. of Evidentiary Hr'g 376-77 [Dkt. No. 75], whereas Officer Spieth testified that the basement door was locked when they approached it with Carlos. Tr. of Evidentiary Hr'g 83 [Dkt. No. 76]. *See also United States v. Sugar*, 322 F.Supp.2d 85, 95 (D. Mass 2004) ("In these circumstances, the fact that [defendant] did not have a key to the closet does not defeat standing because he had a legitimate expectation of privacy in the room containing the closet.").

defendant had previously been to the apartment and there was "no indication he was living there or had spent an occasional night there." 500 F.3d at 1163-64. The court also noted, however, that staying overnight is not required to have a reasonable expectation of privacy. *Id.* at 1164 (citing *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004)). And conflicting testimony casted doubt on whether defendant and the owner of the apartment were dating at the time of the search, with the latter and her mother denying that was the case. *Id.* at 1164 n.8.

As established by the authorities discussed above, however, Carlos need not have resided in Eduardo's apartment to have an expectation of privacy that is protected by the Fourth Amendment there. Carlos was the tenant responsible for the rent for the entire home under the written lease and appears to have enjoyed "unfettered access" to Eduardo's apartment. *Heath*, 259 F.3d at 533. To the extent that the two portions of the house can be viewed as "two living units, they all lived there as one family." *King*, 227 F.3d at 748. And, based on these living arrangements and the totality of the circumstances, "it is reasonable to assume that [defendant] had the authority to exclude persons other than his [family] and their guests from the home," as the *Haydel* court found was reasonable to assume based on the circumstances in that case. *Haydel*, 649 F.2d at 1155; *see also King* 227 F.3d at 749 (finding that, as a tenant of the two-unit dwelling, "Defendant had a right to exclude anyone who was not a tenant from the basement area, unless that person had been invited by one of the other tenants"). Moreover, given the close pre-existing familial ties, the indications of acceptance into the household, and Carlos' role as both responsible tenant and apparently lead drug trafficker in the home, it is superfluous that there does not appear to be any testimony as to whether Carlos ever actually slept downstairs in his brother's apartment, particularly in light of the Tenth Circuit's holdings in *Poe*, 556 F.3d at 1122 and *Cook*, 344 Fed. App'x at 476. Finally, as in *King*, the evidence shows that Carlos "was

legitimately on the premises inasmuch as he paid rent to live" there and "he took normal precautions to maintain his privacy in the basement area insofar as the basement was not open to the public, the other tenants were family members, and there was an outside door to the basement which remained closed." *King,* 227 F.3d at 749.

The court therefore finds that Carlos had a legitimate expectation of privacy in the basement apartment occupied by Eduardo and is therefore capable of claiming protection under the Fourth Amendment against the illegal search performed there. Carlos was therefore able to challenge the admissibility of the drugs seized in the basement apartment, and the court has already suppressed that evidence from use against him in its previous order. The court must now consider whether the exclusionary rule functions to suppress Carlos' statement to Agent Gamarra and Detective Barney as well.

**B.      The exclusion of Carlos' statement**

Under the exclusionary rule, "the government may not introduce into evidence tangible materials seized during an unlawful search or testimony concerning knowledge acquired during an unlawful search." *United States v. Henderson*, 595 F.3d 1198, 1201 (10th Cir. 2010) (quoting *Murray v. United States*, 487 U.S. 533, 536 (1988)). Defendants contend that Carlos' statement to police following the illegal search of Eduardo's downstairs apartment concerned knowledge that drugs had been found in Eduardo's downstairs apartment and that he would not have made such a statement absent the illegal search of Eduardo's downstairs apartment. The court agrees and finds that Carlos' statement must be suppressed under the exclusionary rule.

The government argues that Carlos' statement should not be suppressed because there is no factual nexus between the finding of the drugs in the basement and Carlos' later admission. The court does not find this assertion to be supported by the evidence. References to the

discovery of drugs in Eduardo's downstairs apartment were made throughout the interview of Carlos. *See* Tr. of Interview of Carlos Miranda-Cortez, Gov't Ex. 8A, pp. 6, 13, 14, 20 [Dkt. No. 67]. Not only does the transcript of the interview show that Carlos was aware of the drugs discovered in the downstairs apartment, it also shows that the officers used the fact that Eduardo had been caught with drugs to persuade Carlos to admit to having drugs in his residence. *See Id.* at 19-28. The record establishes that in giving his statement, Carlos was aware that drugs had been discovered in the illegal search of Eduardo's downstairs apartment. The court therefore finds that Carlos' statement was "testimony concerning knowledge acquired during an unlawful search," *Henderson*, 595 F.3d at 1201, because the discovery of the drugs in Eduardo's downstairs apartment was a "but for" cause of Carlos' statement. *See United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) ("[The defendant] must show 'but for' causation; that the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.") (internal quotation marks and citation omitted).

Even if a defendant can show that an illegal search was the "but for" cause of a later testimonial statement to police, the government can still avoid suppression of the statement by showing that the evidence (1) "would have been inevitably discovered," (2) that it was "discovered by independent means," or (3) that it was "so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation." *Id.* at 999 (citation omitted). The government argues that all three exceptions to the exclusionary rule apply to Carlos' statements.

### 1. Inevitable Discovery

The inevitable discovery exception to the exclusionary rule applies if "the evidence would have been discovered by lawful means." *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) (citation omitted). "The government has the burden of proving by a

preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *Id*. (citation omitted). Thus, the government must come forward with evidence to show that Carlos' admission that he had drugs in his upstairs residence would have occurred in the absence of the illegal search of Eduardo's apartment.

The government, however, does not present any evidence that Carlos' admission would have occurred in the absence of the illegal search of Eduardo's downstairs apartment. Instead, the government merely argues that the drugs in Carlos' residence would have been inevitably discovered. While that may be true, it is not relevant to the admissibility of Carlos' statements. The government has failed to meet its burden of showing that Carlos' admissions to police would have been inevitably made in the absence of the illegal search of Eduardo's apartment.

### 2. Independent Source

Illegally obtained evidence may also be admitted if it was lawfully obtained through an independent source. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1165 (10th Cir. 1995) (citing *Murray*, 487 U.S. at 536-44). To show that the independent source exception should apply in this case, the government must show that Carlos' admissions were obtained through lawful means independent of the illegal search of Eduardo's downstairs apartment.

The government has provided no such evidence. There is no evidence of a second interview of Carlos Miranda-Cortez that resulted in Carlos making another admission. Similarly, there is no evidence in the record that Carlos made a second admission in the same interview conducted by police that was not motivated, at least in part, by the discovery of drugs in Eduardo's downstairs apartment. The government argues that the exception should apply because Carlos had a knowledge of the drugs in his apartment that was independent of the

discovery of drugs in Eduardo's apartment. While that is likely true, it is not relevant to the question of whether Carlos' admission was obtained by alternative lawful means.

### 3. Attenuation

The final exception to the exclusionary rule applies to a confession that is "an act of free will sufficient to purge the primary taint of the unlawful invasion." *Kaupp v. Texas*, 538 U.S. 626, 632-33 (2003) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). The question of whether a confession is sufficiently attenuated from the initial illegal search is not subject to any per se rule, but must be "answered on the facts of each case." *Brown v. Illinois*, 422 U.S. 590, 603 (1975). While no single factor is dispositive, the Supreme Court has identified several factors to consider when determining whether a confession is sufficiently attenuated to bar application of the exclusionary rule—(1) whether the defendant had received *Miranda* warnings; (2) the "temporal proximity of the [violation] and the confession"; (3) the "presence of intervening circumstances"; and (4) the "purpose and flagrancy of the official misconduct." *Id*. at 603-604 (citations omitted). The burden of showing admissibility rests on the prosecution. *Id*. at 604.

According to the government, the evidence shows that Carlos' admission was an act of free will sufficient to purge the taint of the initial unlawful search. Specifically, the government points to the fact that Carlos left the basement freely and of his own volition; spoke to a different set of officers than the ones that conducted the illegal search; received and waived his *Miranda* warnings; and spoke voluntarily to the officers. *See* Resp. of United States to Supp. Briefing 12 [Dkt. No. 85]. The government also points out that Defendants make no allegations that the officers engaged in coercive actions to induce Carlos' admission. *Id*.

Assuming that all these factual allegations are accurate, they are not sufficient, by themselves, to show attenuation. The government must do more than show that Carlos received *Miranda* warnings and made a voluntary statement. *Brown*, 422 U.S. at 601-602.

The government also alleges that Carlos' admission that there were drugs in his upstairs residence came about as a result of Carlos learning that Roseli had told police about the drugs. *See* Resp. of United States to Supp. Briefing 12 [Dkt. No. 85]. Thus, according to the government, knowledge of Roseli's confession was an intervening circumstance that led to Carlos' admission and purged the taint of the initial illegal search of Eduardo's apartment.

The government's argument that Roseli's confession was an intervening circumstance that caused Carlos to admit that there were drugs in his upstairs residence might have been sufficient to show attenuation if the evidence in the record were sufficient to show that Carlos was aware of Roseli's confession. The record, however, does not support the government's assertion that Carlos was aware of Roseli's confession and that it caused Carlos to admit to having drugs in his house. The transcript of the interview of Carlos contains no reference to Roseli until after Carlos admitted that he had drugs in his home. *See* Tr. of Interview of Carlos Miranda-Cortez, Gov't Ex. 8A [Dkt. No. 67]. After admitting that there were drugs in his home, Carlos speculated that Roseli had already told the police where the drugs were located, stating "I imagine my wife has already told them." *Id*. at 28. Carlos' speculation about what Roseli may have told the police is not evidence that he knew his wife had admitted that there were drugs in the couple's home, and it is only weak circumstantial evidence for the proposition that Carlos was motivated to make his admission because he believed his wife had already confessed.

Moreover, the evidence shows that Carlos' admission was motivated by his knowledge that the officers had discovered drugs in Eduardo's downstairs apartment. Immediately before

Carlos admitted his involvement with the drugs and told the police about the drugs in his home, the officers conducting the interview confronted Carlos with the allegation that Eduardo had been caught and was cooperating with the police. *Id*. at 20. The evidence shows that it was Carlos' belief that Eduardo was cooperating with the police, and that the police would believe Eduardo more because he had already been caught, that motivated Carlos to tell the truth about his involvement with the drugs and the presence of drugs in his house. *Id*. at 19-28.

The government has failed to meet its burden of showing that the exclusionary rule should not be applied to Carlos' admission, which was obtained as a result of the illegal search of Eduardo's basement apartment. As a result, Carlos' statements to Officer Barney and Agent Gamarra will be excluded.

## II.     STATEMENT OF ROSELI

While the same legal framework that the court relied on to determine that Carlos' admissions were inadmissible applies to the statements that Roseli made to police, the court reaches the opposite conclusion. This is because Defendants have not met their burden of showing that Roseli's statements concerned "knowledge acquired during an unlawful search." *Henderson*, 595 F.3d at 1201. Instead, the court finds that Roseli's statements regarding the presence of drugs in the home where she resided were obtained through independent lawful means, and not as a result of the illegal search of Eduardo's downstairs apartment.

Defendants argue that the evidence on the record shows that Roseli's admissions regarding the upstairs drugs was only obtained after Roseli learned that drugs had been discovered in Eduardo's apartment, making her statements to law enforcement tainted by the illegality of the initial search. The evidence does not support Defendants' argument.

According to the testimony of Agent Gamarra, while officers went with Carlos down to Eduardo's basement apartment, Agent Gamarra and Agent Mathis remained upstairs where they had been invited into the home. *See* Tr. of Evidentiary Hr'g 188 (Dkt. No. 77.) Discovering that Roseli was an individual who had previously been deported from the United States, Agent Gamarra informed Roseli that she was under arrest and informed her of her *Miranda* rights in Spanish. *Id*. at 194. Roseli then indicated that she understood her rights, waived them, and agreed to talk with Agent Gamarra about the drugs. *Id*. at 195. According to Agent Gamarra, it was during this initial interview that Roseli admitted that there were drugs in her home and where they were located. *Id*. at 196. After learning this information, Agent Gamarra testified that he stopped the interview and informed Detective Barney of Roseli's statements. *Id*. at 197. Detective Barney then conducted a second interview with Roseli after again giving her her *Miranda* warnings. *Id*. at 198-99. Agent Gamarra testified that Detective Barney told him of the discovery of drugs in Eduardo's basement apartment only after Roseli's initial admission that drugs were hidden upstairs in the house. *Id*. at 197.

Defendants identify several pieces of circumstantial evidence that they believe undermine Agent Gamarra's testimony. Defendants point to the fact that Agent Gamarra did not affirmatively state that he first learned about the downstairs drugs from his conversation with Detective Barney and that the initial interrogation of Roseli was not recorded. This circumstantial evidence does not show that Agent Gamarra's testimony was necessarily lacking in credibility. In any case, in the absence of evidence that Agent Gamarra used the discovery to influence Rosali's statement, this assertion has little relevance to the question of whether the discovery of drugs in Eduardo's downstairs apartment was the "but for" cause of Roseli's admissions.

Defendants also argue that Agent Gamarra had a radio and likely received a radio message that drugs had been discovered in the downstairs apartment while questioning Roseli. The evidence shows that Agent Gamarra may have had radio with him during the interview of Roseli, but Defendants present only weak circumstantial evidence at best to show that Agent Gamarra learned of the discovery of drugs in Eduardo's apartment via this radio. Indeed, it is not clear that a radio call alerting all the officers that drugs had been discovered in the basement was even made. Defendants point to Detective Barney's testimony that he received a "call over the radio" about two or three minutes after officers had entered the basement, alerting him that drugs had been discovered. *See* Tr. of Evidentiary Hr'g 19 [Dkt. No. 76]. It is not clear whether the radio call was made only to Officer Barney, or was made generally so that all officers involved could hear. The evidence also shows that the radios used by the officers were capable of being turned off or set so that only the user of the radio could hear the broadcast. *See Id*. at 137-38. Moreover, other officers present at Defendants' home testified that they did not hear any radio message about the discovery of drugs in Eduardo's basement apartment. *Id*. at 237.

Defendants' circumstantial evidence is insufficient to show that Agent Gamarra received a radio message that drugs had been discovered in Eduardo's basement apartment during his interview of Roseli. Furthermore, even if the court assumes that Agent Gamarra did learn of the discovery of drugs in Eduardo's basement apartment during his interview of Roseli, Defendants have offered no evidence to show that Roseli was aware of the discovery or that Agent Gamarra informed Roseli of the discovery in order to convince her to admit that there were drugs in the upstairs residence. Defendants' arguments amount to little more than speculation, which is not sufficient to show that Roseli's admissions were caused by the illegal search of Eduardo's apartment.

Because Roseli's admission was not the fruit of the officer's illegal search of Eduardo's basement apartment, it is not subject to the exclusionary rule unless Defendants can show that it was obtained by means of a separate independent constitutional violation. Defendants have made no such contention and the court accordingly denies Defendants' motions to suppress Roseli's statements.[4]

## III.    SEARCH OF CARLOS' UPSTAIRS RESIDENCE

Even when a search warrant is based on a warrant affidavit that makes reference to illegally obtained evidence, such as the drugs in Eduardo's basement apartment or Carlos' subsequent statement to police about drugs upstairs, the warrant remains valid if "sufficient untainted evidence was presented in the warrant affidavit to establish probable cause." *United States v. Karo*, 468 U.S. 705, 719 (1984). When a warrant affidavit makes reference to unconstitutionally obtained evidence, the appropriate method of determining the validity of the warrant is to "purge[] the affidavit of the offending facts and examine[] whether the remaining facts still afford[] a substantial basis for concluding that the search warrant was supported by probable cause." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001).

Following this method, the court must determine whether Officer Spieth's warrant affidavit would have been sufficient to support probable cause for a search warrant had all references to the discovery of drugs in Eduardo's basement apartment and to Carlos' subsequent admissions been removed. The court determines that it would and, as a result, does not need to address the government's appeal to the good faith exception to the exclusionary rule available under *United States v. Leon*, 468 U.S. 897 (1984) and its progeny.

---

[4] Because the court has determined that the drugs found upstairs were obtained pursuant to a valid search warrant and are not subject to the exclusionary rule, the court need not analyze the government's arguments that Eduardo does not have standing to challenge their admissibility.

Although a large portion of Officer Spieth's warrant affidavit makes reference to evidence that is inadmissible against Defendants, references to Roseli's admission that there were drugs in the upstairs residence are sufficient to show that there was probable cause for a search warrant of the upstairs residence. The affidavit detailed the conversation that Agent Gamarra had with Roseli and gave specific information about the involvement of Carlos and Eduardo in the distribution of methamphetamine and the precise location and amount of the drugs hidden in the attic of the upstairs residence. Even if all the other information in the affidavit had been excised, the detailed description of Roseli's statements to Agent Gamarra were sufficient, alone, to provide probable cause for the search warrant of the upstairs residence.

Based on this information, however, the search warrant affidavit was only sufficient to sustain a search warrant for the upstairs residence, and not the entire house. The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, "the scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Roseli's admission that there were drugs in the attic upstairs does not provide probable cause to believe there were also drugs in Eduardo's basement apartment. The scope of the search warrant based on Roseli's admission would be confined to the attic of the upstairs residence where Roseli said drugs were hidden, and not the entire house. The fact that the search warrant was valid with respect to the drugs found upstairs does not cure the constitutional violation that led to the discovery of the drugs in the downstairs apartment.

Because the search warrant that officers were relying on when they discovered drugs in the attic of Carlos and Roseli's upstairs residence was valid, the search and subsequent seizure of

the drugs upstairs did not violate Defendants' constitutionally protected rights. Therefore, Defendants' motions to suppress are denied with respect to the drugs found upstairs.

## CONCLUSION

For the reasons stated above, the court hereby GRANTS IN PART and DENIES IN PART Defendants' motions to suppress certain pieces of evidence. More specifically, the court GRANTS Defendant Eduardo Miranda-Cortez's motion to suppress [Dkt No. 25] with respect to the statements made by Carlos Miranda-Cortez to law enforcement officers, and DENIES Defendant Eduardo Miranda-Cortez's motion to suppress with respect to statements made by Roseli Valenzuela-Lopez to law enforcement officers and with respect to drugs found upstairs in the home. In addition, the court GRANTS Defendant Carlos Miranda-Cortez's motion to suppress [Dkt. No. 33] with respect to drugs seized in the basement apartment and his subsequent statement to officers but DENIES Defendant Carlos Miranda-Cortez's motion to suppress Rosali's statements or drugs found upstairs.

DATED this 14th day of September, 2012.

BY THE COURT:

Clark Waddoups
United States District Judge